## No. 17,549.

### Mary Jane Bird v. Earl Allen Bird.
(285 P. [2d] 816)

Decided July 11, 1955.

Mr. W. W. Seaman, Mr. Conrad L. Ball, for plaintiff in error.

Messrs. Chilson & McCreary, for defendant in error.

*En Banc.*

Mr. Chief Justice Alter delivered the opinion of the Court.

THE subject of this review is an order of the district court modifying its custodial award previously made by the trial court in its final decree of divorce dated February 11, 1947, under which decree the wife, plaintiff in the divorce action, was awarded the sole care, custody and control of the minor children of the parties, i.e., Tommy Allen Bird, Judith Ann Bird, and Michael Lewis Bird, with orders therein with reference to the payment of alimony and support money for the minor children. On April 20, 1954, Earl Allen Bird, the husband, father of the minor children, and defendant in the divorce action, filed his petition in the district court, and, as a result of the hearing upon his petition, a modified custodial order was made and entered, and it is from the modification order that this review is sought.

The record discloses that plaintiff's divorce was granted on the grounds of defendant's extreme and repeated acts of cruelty.

Defendant, in May, 1949, remarried, now resides in Albuquerque, New Mexico, and is the father of two children by his second marriage, one being about four years old and the other about seventeen months. Defendant owns his home in Albuquerque, which is sufficiently large to care for his children by his second marriage, as well as Tommy, Judy and Mike, who at the time of the hearing were approximately sixteen, thirteen and eleven years of age, respectively. Both the father and stepmother are in all respects, according to the record, proper persons, interested in the children, and have provided the two younger children at all times since 1951 with proper parental care and a suitable, comfortable home. Defendant is a governmental employee at a monthly salary of approximately $350.00. The work in which he is engaged is such that he is obliged to be away from home from noon one day until 5:40 P.M. the following day, and in response to a question he stated: "I make a couple of trips like that, I have a day off. I

make a couple more trips, I have three days off. I make another trip and I have five days off."

Plaintiff remarried in April, 1951, and in May, 1953, obtained a divorce. Subsequent to 1951, when the children of the parties here went to live with defendant in Albuquerque because of conditions hereinafter explained, plaintiff visited her children on several occasions, and in the latter part of 1953 she moved to Albuquerque, obtaining employment in a cafe. When asked if she went to Albuquerque with the intention of taking the children or being close to them, she stated: "I don't really know what my intentions were. I was so homesick for them I couldn't stand it any longer, and when I got there the situation was rather unhappy, and I got a job until it would be straightened out." Plaintiff now lives in a three-bedroom home in Enumclaw, Washington, with her three children and her mother; she is employed at a monthly salary of $190.00 and works from 7 A.M. until 3 P.M. five days a week. Her mother, now aged sixty-four, is employed, working from 9:30 A.M. until 7 P.M. In the small town in which the plaintiff and her children are now living, two of plaintiff's brothers-in-law are engaged in business, and Tommy, Judy and Mike are all attending school.

The record discloses that when domestic difficulties between plaintiff and defendant arose in the latter part of 1945 or early 1946, plaintiff and her three children went to live with her father and mother at a resort town about eleven miles westerly of Loveland, Colorado, and while plaintiff was employed in assisting her father in a cafe and 3.2 beer parlor, the children were in charge of plaintiff's mother. Some time prior to March, 1951, plaintiff's father became involved with some woman other than his wife, and this involvement caused local gossip and apparently considerable embarrassment to plaintiff's children.

In March, 1951, defendant visited his children and was then requested by plaintiff to take the two younger

children with him to Albuquerque, thus removing them from the family discord arising from her father's involvement. Defendant phoned his wife, and she readily consented to the two younger children being brought to their home in Albuquerque. Tommy was at that time attending junior high school in Golden, residing with one of plaintiff's sisters, and subsequently, at the conclusion of the school year, he also went to Albuquerque to reside with defendant and his wife.

While the two younger children were with defendant and their stepmother, they attended Sunday School regularly, were interested in scout activities, and were given proper care in a comfortable home. Until plaintiff and her mother came to live in Albuquerque, the two younger children seemed to be happy in defendant's home.

It appears that Tommy became somewhat of a problem occasioned by his tendency to play "hookey." Defendant discussed Tommy's proclivities with the school authorities, and finally with the school counselor, as a consequence of which Tommy was placed in a detention home for several days and was released at his mother's insistence, after having been warned that a repetition would result in his being sent to the reform school. Tommy thereupon went to reside with his mother and continued to live with her until some time in April, when plaintiff and her mother, who had recently come to Albuquerque, and the three children all departed for Washington without giving defendant an opportunity of intervening by court action as he had threatened. Plaintiff explains her sudden departure from Albuquerque by the statement that she did not have sufficient funds to litigate her right to the custody of her children.

This record presents a most unusual problem for in it there is not a word reflecting upon the character, reputation or parental love and care of either plaintiff or defendant. Defendant himself testified that plaintiff's mother was a fit and proper person to have charge and care of the children and had all the affection and love

for them that a parent should have. It appears from the record that defendant and his wife are highly respectable and want to assist in giving Judy and Mike the care, attention and training necessary to fit them for life's work, and it also appears that plaintiff and her mother are equally interested in the children and desirous of educating, caring for and raising them in a proper home environment. Tommy, for some reason, has developed an intense dislike for his father and will not willingly return to him.

At the conclusion of the testimony, the judge seemed to be in somewhat of a quandary and announced that before determining plaintiff's petition for a modification of the custodial order entered at the time of the divorce he would undertake some method of learning of the children's wishes as to their future home. Accordingly, on April 6, 1953, he wrote each of the children a letter, and before doing so cautioned both plaintiff and defendant that they were not to influence the children whatever in the answers to the questionnaire which he enclosed with his letter. The answers to the questionnaires disclosed that all three children were in public school.

Mike was in the sixth grade. He answered that he didn't like the Washington schools because they were harder, and stated that he preferred the Albuquerque school because there wasn't so much work and he was the teacher's pet, but he concluded his questionnaire by stating, "I'd rather stay in Washington."

The questionnaire developed that Judy was in the eighth grade and had a preference for the Washington teachers and children, stating that the Mexicans in the Albuquerque school were objectionable to her. She concluded her questionnaire by stating, "I want to stay in Washington with my mother all the time."

Tommy answered his questionnaire by stating that he was in the twelfth grade in high school and liked Washington better than Albuquerque because he had "better luck with teachers and subjects" and did not like

Albuquerque schools for reasons that he couldn't explain. He stated that he couldn't get along with his father and that he intended to stay in Washington "and I believe its the best place for Mike and Judy and we should all be together."

The trial judge seemed somewhat critical because plaintiff had taken the children from Albuquerque without giving defendant reasonable notice of her intention and stated that her action amounted "to a kidnapping." This characterization of plaintiff's action is somewhat inexplicable in view of the fact that this same trial judge had signed the interlocutory and final decree of divorce awarding the custody of the minor children to plaintiff and that order in April, 1954, was still in full force and effect, and plaintiff's request made in March, 1951, that defendant take the children to his home in Albuquerque did not amount "to a waiver of the original Order as to the custody," as a waiver under the circumstances here not being in the power of either plaintiff or defendant to the divorce action.

At the conclusion of the evidence the trial court was concerned about defendant's visitation if the children were to remain in Washington, and in this connection said, "I notice the decree in this case didn't prohibit the taking of the children from the jurisdiction, but obviously the mother taking the children out to Washington makes it impractical, if not impossible, for the father to have any visitation privileges at all." and in the order entered by the trial court prior to its final order here we find, "Visiting privilege to plaintiff, if she can accomplish such visits, should be given her."

At the conclusion of the hearing the trial judge stated, "It is a matter of continuance, with advice to the parties and their counsel, that I will attempt in some manner to determine the situation in the respective places independent of what the parties testified to. Not necessarily to doubt their word at all, but the fact that I have got to know, in some manner find out what the mental atti-

tude of these children are before I can determine what their interests are. * * * "

Defendant's counsel in their brief are somewhat critical of plaintiff's request that the children be removed from the environment of her father's home. When it is considered that defendant himself, at the time the interlocutory decree was entered, voluntarily consented that plaintiff should have the custody of his children, and, so far as the record is concerned, she gave them all of the motherly care and attention the children could possibly merit until conditions in her parent's home became such that she considered it no longer advisable for her children to be raised in such an environment, it conveys a rather unusual motherly interest in the children's welfare for her to suggest that they be removed to some other place where they would not be subjected to the shame and humiliation and embarrassment which they suffered while with her.

Counsel for defendant also seem to believe it to be a reflection upon plaintiff that she allowed her two younger children to remain with defendant from March, 1951, until 1954, without seeking to regain their actual custody, but when it is considered that she was in no position to properly house, care and control a household until her mother came to live with her, her failure to sooner regain actual custody under the court order is explicable.

At the conclusion of the evidence the trial judge commented upon the fact that plaintiff was working five days a week from 7 A.M. until 3 P.M., and that the grandmother was employed from 9:30 A.M. until 7 P.M., and the two younger children would be alone part of the time. In this connection it is said: "it is clear that the father under the present situation is making out a clearer case as to the welfare of those children. And to be out there where both the mother and grandmother are working, it certainly can't be a normal home, and that is rather serious with children the age of Judith and Michael." In connection with this comment, it must be

remembered that during the school term Judy and Mike are in the care of their mother or grandmother at all times except while attending school. In vacation time these two children are alone in their home from 9:30 A.M. until 3 P.M., during which time they have the opportunity of a public playground, swimming pool, and other recreational facilities after they have completed their minor household duties. We believe that during the vacation period the children are not unduly handicapped by the absence of their mother during the short daytime period, and when we realize that the father is absent from his home on business, as he has testified, we are unable to agree with the trial court that his home offers the children any greater supervision and care than they receive in their mother's home.

We are well aware of repeated decisions of this court which authorize a modification of a custodial order where there is a change in circumstances and conditions, and the modification will be beneficial to the minor, and also equally aware of the fact that the power and authority to enter an order changing custody is a matter within the sound discretion of the trial court and cannot be set aside unless there is an abuse of discretion. All the decisions of this court relative to changes in custodial orders have been read and considered and furnish no guide for our decision here. As we understand the trial court's statement at the conclusion of all of the evidence, it was a frank admission on the part of the trial judge that he was in a quandary and at loss to know what to do until he had received information from the minor children. The answers to the questionnaires all definitely indicate that the three children wanted to remain with their mother in Washington and each gave specific reasons therefor, some of which were more or less persuasive.

It is obvious from the record that if the modified custodial order is upheld, the children in this little family will be divided, Tommy remaining with his mother, and Judy and Mike remaining with the father. There are no

uncomplimentary, derogative or unkind utterances in the entire record reflecting upon either plaintiff or defendant; both seem to have a real and genuine desire to help these unfortunate children overcome the handicap resulting from a divided household; plaintiff has demonstrated her motherly regard for her children and her interest in their welfare, and defendant has likewise exhibited a parental regard for his children. The mother has availed herself of the first opportunity of providing a suitable home for her children, and under all the circumstances should have the right to their custody.

.Upon the record here we find that the trial court abused its discretion in modifying the custodial order contained in the decree of February 16, 1947, and the cause is remanded to the district court with instructions to expunge its modified custodial order from the record.